SECURITIES AND EXCHANGE COM-
MISSION, Plaintiff-Appellee,

v.

PROFESSIONAL ASSOCIATES and
Robert C. LaBine,
Defendants-Appellants.

No. 82–1398.

United States Court of Appeals,
Sixth Circuit.

Argued Oct. 11, 1983.

Decided April 10, 1984.

Reese C. Lenheiser, Hoops & Hoops, Frederick K. Hoops, argued, Detroit, Mich., for defendants-appellants.

Gilbert Miller, Anita Nagler, Rosalind Cohen, argued, Washington, D.C., Mark Loush, Detroit, Mich., for plaintiff-appellee.

Before ENGEL and KENNEDY, Circuit Judges, and BROWN, Senior Circuit Judge.

BAILEY BROWN, Senior Circuit Judge.

This is an appeal from a district court's grant of a preliminary injunction sought by the Securities and Exchange Commission (SEC or Commission) enjoining the defendants from offering or selling various types of investments, including units in an "escrow account," trust accounts, and interests in joint ventures. The SEC charged that the investments involved were investment contracts and as such were securities, and that the defendants were selling them in violation of registration and antifraud provisions of the federal securities laws. The district court ruled that the investments were securities, and issued a preliminary injunction enjoining further activity in them, freezing the defendants' assets, and appointing a receiver to oversee the assets.

On appeal, the defendants contend that the district court erred in concluding that the investments were securities.[1] The defendants also contend, with respect to the

finding that the trust accounts were securities, that the court erred in considering statements contained in defendants' sales brochures and in considering evidence pertinent to the actual operation of the trusts; they contend that the district court should have confined itself to the four corners of the trust instruments.

We hold that the district court properly considered evidence extrinsic to the terms of the trust instruments. We further hold that the district court did not abuse its discretion in granting the temporary injunction since it determined on adequate evidence that defendants had violated and would continue to violate the securities laws unless enjoined.

Defendant Professional Associates (Professional), formed by defendant Robert LaBine, Sr. and others, is an unincorporated association that offers financial planning services. Neither Professional nor LaBine is registered with the SEC as a securities broker-dealer. The three types of investments Professional offered were: (1) units in an escrow account; (2) individual trust accounts; and (3) interests in joint ventures formed by Professional for the purpose of commercially exploiting leased phonographic record master tapes.

Professional described the escrow account as "a fund into which money is deposited for the purpose of earning interest on the principal invested in return for a promissory note [payable to the investor] written by Professional Associates." Professional represented that these funds would be invested in residential mortgages, diamonds, and securities but there is evidence that they were actually invested in a money market fund.

Effective in January 1982, before this action was filed but after the investigation had begun, Professional replaced its escrow account investments with two types of trust arrangements, Type A and Type B. Under the Type B arrangement, LaBine

---

1. The defendants conceded below that the only determinative issue on the SEC's application for temporary relief was whether the involved investments were securities within the meaning of the federal securities laws.

was appointed trustee and authorized to invest trust funds in various investments, including diamonds, antiques, real estate and securities. Investments in the Type B accounts totalled $4.2 million. Under the Type A arrangement, LaBine was appointed trustee and authorized to invest the funds in a retail repurchase agreement ("Repos") administered by a bank in Montpelier, Ohio.[2] Investments in these accounts totalled approximately $100,000.

The third type of investment offered by Professional involved interests in joint ventures designed to exploit master record leases.[3] These interests were sold through nationwide seminars. Approximately 1500 investors in 30 states have invested around $15 million in these interests.

In April 1982, the SEC filed a complaint with the United States District Court for the Eastern District of Michigan, charging Professional and LaBine with violations of the federal securities laws.[4] The Commission requested a temporary restraining order and preliminary and permanent injunctions restraining and enjoining Professional and LaBine from further violations of the registration and antifraud provisions of the federal securities laws and other equitable relief. During the hearings on the SEC's motion, the Commission presented both documentary evidence and the testimony of witnesses in support of its allegations. La-

Bine and others associated with Professional asserted their fifth amendment privilege and generally refused to testify, offering evidence only on the issue whether the joint ventures were securities. On May 5, 1982, the district court entered an order which determined that the defendants had engaged and were continuing to engage in conduct which violated the registration and antifraud provisions of the Securities Act of 1933 and the Securities Exchange Act of 1934, and would continue to do so unless enjoined.[5] The court accordingly preliminarily enjoined the defendants from offering or selling interests in the escrow account, trust accounts, joint ventures or any other securities unless they were first registered with the Commission, and until the defendants registered with the Commission as broker-dealers. The court also enjoined the defendants from engaging in fraud in the offer and sale of securities, ordered all of the defendants' assets frozen, and appointed a receiver to oversee those assets.

■ On July 10, 1982, the district court issued, in support of its order, its Findings of Fact and Conclusions of Law, in which it made clear that its action was based on its preliminary conclusion that the investments offered by the defendants were investment contracts and as such were securities within the meaning of the Acts. An investment

2. The exact nature of the Type A trusts was not made clear in the proceedings below largely because of the defendants' decision to plead the fifth amendment.

3. "A 'master' is a multi-tracked tape on which is recorded the final version of a recording combining the best elements from a number of live recording sessions and which is deemed suitable for commercial release on vinyl records. The music as recorded on the master is transferred to a mold which presses out vinyl records for public sale." (Appellee's Brief, p. 15, n. 10.)

4. The SEC alleged violations of the securities registration provisions of Sections 5(a) and 5(c) of the Securities Act of 1933, 15 U.S.C. 77e(a) and 77e(c); the antifraud provisions of Sections 17(a)(1), 17(a)(2) and 17(a)(3) of the Securities Act, 15 U.S.C. 77q(a)(1), 77q(a)(2), and 77q(a)(3); the antifraud provisions of Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. 78j(b), and Rule 10b–5 thereunder, 17 CFR 240.10b–5; the broker-dealer registration

provisions of Section 15(a)(1) of the Securities Exchange Act, 15 U.S.C. 78*o*(a)(1); the investment adviser registration provisions of Section 203(a) of the Investment Advisers Act of 1940, 15 U.S.C. 80b–3(a); and the antifraud provisions of Sections 206(1), 206(2), and 206(4) of the Investment Advisers Act, 15 U.S.C. 80b–6(1), 80b–6(2), and 80b–6(4), and Rule 206(4)–1(a)(5) thereunder, 17 CFR 275.206(4)–1(a)(5).

5. The district court found that the defendants "are engaged and are about to engage in acts and practices which constitute and will constitute violations of Sections 5(a), 5(c) and 17(a)(1), (2) and (3) of the Securities Act of 1933, as amended [15 U.S.C. 77e(a), 77e(c), 77q(a)(1), (2), and (3)], Sections 10(b) and 15(a)(1) of the Securities Exchange Act of 1934, as amended [15 U.S.C. 78j(b) and 78*o*(a)(1)], and Rule 10b–5 promulgated thereunder [17 CFR 240.10b–5]." (Appendix p. 54)

contract involves (1) an investment of money (2) in a common enterprise (3) with a reasonable expectation of profits to be derived solely from the efforts of others. *SEC v. W.J. Howey Co.*, 328 U.S. 293, 66 S.Ct. 1100, 90 L.Ed. 1244 (1946); *Union Planters National Bank of Memphis v. Commercial Credit Business Loans, Inc.*, 651 F.2d 1174, 1181 (6th Cir.), *cert. denied*, 454 U.S. 1124, 102 S.Ct. 972, 71 L.Ed.2d 111 (1981). An investment contract is a security for purposes of both the Securities Act and the Securities Exchange Act. Section 2(1) of the Securities Act provides:

> The term "security" means any note, stock, treasury stock, bond, debenture, evidence of indebtedness, certificate of interest or participation in any profit-sharing agreement, collateral-trust certificate, preorganization certificate or subscription, transferable share, *investment contract*, voting-trust certificate, certificate of deposit for a security, fractional undivided interest in oil, gas, or other mineral rights, or, in general, any interest or instrument commonly known as a "security", or any certificate of interest or participation in, temporary or interim certificate for, receipt for, guarantee of, or warrant or right to subscribe to or purchase, any of the foregoing.

15 U.S.C. § 77b(1) (emphasis added). Section 3(a)(10) of the Securities Exchange Act provides:

> The term "security" means any note, stock, treasury stock, bond, debenture, certificate of interest or participation in any profit-sharing agreement or in any oil, gas, or other mineral royalty or lease, any collateral-trust certificate, preorganization certificate or subscription, transferable share, *investment contract*, voting-trust certificate, certificate of deposit, for a security, or in general, any instrument commonly known as a "security"; or any certificate of interest or participation in, temporary or interim certificate for, receipt for, or warrant or right

to subscribe to or purchase, any of the foregoing; but shall not include currency or any note, draft, bill of exchange, or banker's acceptance which has a maturity at the time of issuance of not exceeding nine months, exclusive of days of grace, or any renewal thereof the maturity of which is likewise limited.

15 U.S.C. § 78c(a)(10) (emphasis added).

■ We note at the outset that review of the grant of a preliminary injunction is limited. The district court's decision should be reviewed under an abuse of discretion standard.[6] Moreover, the district court was authorized to issue a preliminary injunction if it determined that defendants had violated and were likely to continue to violate securities laws unless enjoined. *SEC v. Management Dynamics, Inc.*, 515 F.2d 801 (2d Cir.1975).[7]

The defendants argue, as stated, that the district court was limited to the four corners of the instruments creating the trusts in its determination whether interests in these trusts were securities, and that it erred in considering other evidence relating to defendants' sales pitch and relating to the actual operation of the trusts after the agreements were entered into. The SEC concedes that, as described in the written agreements, the trust investments offered by Professional were not securities. The SEC argues, however, that in reality the trust accounts were securities, and that the district court correctly considered the content of the sales pitch as well as evidence of the actual operations of the investments.

### TYPE B TRUST ACCOUNTS

Our task with regard to the Type B trust accounts is two-fold. First, we must determine whether the district court properly considered evidence extrinsic to the trust accounts. Second, we must decide whether, based only on the evidence properly before it, the district court correctly con-

---

**6.** 7–Pt. 2 Moore's Federal Practice ¶ 65.04[2].

**7.** Section 20 of the Securities Act, 15 U.S.C.A. § 77t(b), and Section 21 of the Securities Exchange Act, 15 U.S.C.A. 78u(d), specifically authorize the Commission to seek injunctive relief.

cluded that these trust accounts were investment contracts.

■ The defendants concede that the Type B trust accounts meet two of the requirements of an investment contract—an investment of money and a reasonable expectation of profits to be derived from the efforts of others—but argue that the third requirement—that the investment be in a common enterprise—is not present. The defendants point out that the horizontal commonality test for a common enterprise is the rule in the Sixth Circuit, as opposed to the less stringent vertical commonality test of the Fifth and Ninth Circuits. *Curran v. Merrill Lynch, Pierce, Fenner and Smith, Inc.*, 622 F.2d 216 (6th Cir.1980), *aff'd on other grounds*, 456 U.S. 353, 102 S.Ct. 1825, 72 L.Ed.2d 182 (1982); *Union Planters National Bank v. Commercial Credit Business Loans, Inc.*, 651 F.2d 1174, 1183 (6th Cir.), *cert. denied*, 454 U.S. 1124, 102 S.Ct. 972, 71 L.Ed.2d 111 (1981). The vertical commonality test requires only that the investor and promoter be engaged in a common enterprise, not that there be a common enterprise between investors. This court, however, has held that there must be a common enterprise between investors, or horizontal commonality. This court, in explaining the horizontal commonality test, has held that "[h]orizontal commonality ties the fortunes of each investor in a pool of investors to the success of the overall venture." *Union Planters*, 651 F.2d at 1183. Therefore, Professional correctly contends that for the Type B trust accounts to be considered investment contracts, there must have existed a common enterprise between individual investors.

The trust agreements themselves provided that each trust would be managed separately, with no mixing or commingling of investors' assets. The district court, however, looked beyond the agreements to find that the required horizontal commonality existed. The court relied in part on Professional's promotional brochure which stated with regard to both the Type A and Type B trust accounts:

The greatest majority of our clients want to 'sleep' nights, and *individually* do not have the purchasing power to move large sums of money, in order to 'maximize' their rate of return.

(Emphasis in original). The court held that this language gave rise to an implication that investors' funds were to be pooled, a situation which would meet the common enterprise requirement.

■■ The courts have found that many investment schemes fall within the definition of a security as defined by the Securities Act and the Securities Exchange Act. As the Supreme Court stated in *Tcherepnin v. Knight*, 389 U.S. 332, 88 S.Ct. 548, 19 L.Ed.2d 564 (1967), "in searching for the meaning and scope of the word 'security' in the Act, form should be disregarded for substance and the emphasis should be on economic reality." *Id.* at 336, 88 S.Ct. at 553. Courts have relied on this directive to look beyond the terms of the parties' agreement to determine whether a security was involved. In *United Housing Foundation, Inc. v. Forman*, 421 U.S. 837, 95 S.Ct. 2051, 44 L.Ed.2d 621 (1975), the Supreme Court was called upon to decide whether shares of a cooperative housing project, sold to the residents of the project, were securities. The Court, in making its decision that the shares, denominated "stock," were not actually securities, relied not only on the agreements between the parties involved but also on an information bulletin published to attract investors. In light of the specific holding of the *Forman* case and the Court's general directive in the *Tcherepnin* case, we hold that the district court acted properly in considering the promotional brochure in making its determination that securities were offered and sold.

■ In reaching its conclusion that a common enterprise existed, the district court also considered testimony concerning the handling of the funds after their investment by the individual investors. This testimony tended to show that the moneys invested by individuals in Type B trust accounts were indeed commingled by the defendants by so investing them in a mon-

ey market fund. The district court's decision to allow testimony to determine whether invested funds had been commingled is in accord with the law of this circuit. In the *Curran* case, 622 F.2d 216, this court held that a discretionary commodity account was not an investment contract because there was no actual pooling of investors' funds. In reaching this decision, the court relied not only on the agreement between the parties, but on testimony by two employees of the defendant that the plaintiffs' money had not been commingled with that of other investors. We conclude that the district court did not err in allowing the oral testimony as to the actual operation of the trusts to show that there was a common enterprise.

The defendants also argue that the trust accounts are not investment contracts because "common law trusts" do not fall within the definition of securities. As the defendants point out, neither the Securities Act nor the Securities Exchange Act specifically includes "trust" within the definition of security. 15 U.S.C. § 77b(1); 15 U.S.C. § 78c(a)(10). Given, however, the Court's statement in *Tcherepnin v. Knight* that a security is a flexible concept which may encompass a wide variety of schemes, the labelling of the investments in question as "trusts" and the fact that they were trusts will not prevent this court from looking at the realities to determine whether securities were offered.

Two cases, arising out of the same scheme, have held that a so-called "trust" may be a security. In *SEC v. Heritage Trust Company*, 402 F.Supp. 744 (D.Ariz. 1975), the court determined that revocable inter vivos trusts sold by a company were actually novel schemes to gain the money of others in return for a promise of profits to the so-called beneficiaries and so were investment contracts. *See also Melton v. Unterreiner*, 575 F.2d 204, 208 (8th Cir. 1978). The defendants attempt to distinguish these cases, arguing that the trustee (LaBine), unlike the *Heritage* trustee, undertook all traditional responsibilities except that the investors waived the prudent man standard for investments. The defendants therefore argue that, since the investors have remedies under state law, this is an additional reason to conclude that the trusts were not securities under federal law.

■ We recognize the differences between the *Heritage* trusts and those operated by LaBine, but we determine that the classification of an investment as a trust does not *ipso facto* prevent it from being a security if it in actuality also, as here, fits the description of an investment contract under the securities law.

■ We conclude, in summary, that the district court properly considered evidence extrinsic to the written trust agreements to determine whether they were in fact investment contracts. We further hold that there was adequate evidence to support the district court's preliminary conclusion that the Type B trust accounts were securities.

## TYPE A TRUST ACCOUNTS

The district court also preliminarily enjoined further activity in Professional's Type A trust accounts. The Type A accounts were considerably less significant, in terms of money invested, than the Type B accounts, and there was a corresponding lack of evidence before the district court concerning the nature of these investments. As noted above, the defendants offered no evidence to the district court concerning the Type A trusts. The SEC offered the promotional brochure, which did not distinguish between the Type A and Type B trusts, and which the court found implied that the investors' funds were to be pooled. There was also testimony by an SEC investigator that "Account A promises 9% annually, total liquidity, and requires a minimum deposit of $25.00." (Appendix 278) This would indicate that the money was to be pooled.

Professional argues that this evidence was insufficient to support the court's finding that the Type A trust accounts were securities. Professional contends that the burden of proving that the trusts were

securities was on the SEC, and that it failed to carry this burden. Professional also contends that, as a matter of law, the Type A trusts were not securities.

LaBine and Professional argue in their brief that the Type A trust funds were invested in retail repurchase agreements ("Repos") under an arrangement with a bank in Montpelier, Ohio. They further argue that, in so investing the funds, there was no commingling since the trustee's records showed the interest of each trust beneficiary in a single retail repurchase agreement. Since, however, these facts were not in the record below, defendants are not entitled to rely on them here, but we may state, in passing, that it is at the very least arguable that this arrangement amounted to a commingling of the trust beneficiaries' funds.

■ We, therefore, conclude that the district court's determination that the Type A trust accounts were securities is supported by adequate evidence.

## JOINT VENTURES

We now turn to the issue whether the district court properly found that the master tape joint ventures were investment contracts. Professional admits that the joint ventures involved an investment in a common enterprise, two of the three elements in an investment contract. Professional argues, however, that the third element, a reasonable expectation of profits to be derived from the efforts of others, did not exist in the joint ventures.

Professional first bases this argument on its assertion that the joint venturers were interested in tax benefits (apparently through investment tax credits) not profits. Putting aside for the moment the question whether a tax benefit can be a "profit" for purposes of the investment test, we will consider whether the joint venturers had a reasonable expectation of a more traditional, obvious type of profit.

As noted by the district court, the defendants' assertion is at odds with statements made to the Internal Revenue Ser-

vice. When questioned by the IRS on their claim that the joint venturers qualified for investment tax credit, the defendants argued that the joint venture investors' motives were profit, a prerequisite for investment tax credit. See 26 U.S.C. §§ 38, 48. In the district court, however, in an attempt to prevent the joint venture interest from being determined to be investment contracts under the securities laws, the defendants argued that the investors were not seeking profits. As the district court so aptly put it, "[t]he defendants' legal position, aside from being incorrect, borders on and may in fact invade the area of fraud itself." (Appendix at 80 n. 4)

■ We believe that on this record, there was sufficient evidence to support the district court's finding that the investors in these joint ventures were motivated by the hope and expectation of profits as well as tax benefits.

Professional also argues that the joint ventures were not investment contracts because the profits came from the efforts of the joint venturers themselves, not solely from Professional's efforts. In making this assertion, Professional relies on the joint venture agreement, which directed that, although Professional was the manager of the venture, all joint venturers were to have a voice in major decisions affecting the venture. The agreement did not, however, set out a procedure for putting this directive into effect. Professional also relies on a managerial change that occurred in May 1981, by which a member of each venture replaced Professional as manager.

■ Usually, a general partnership or a joint venture is not considered a security because the partners or venturers have sufficient power to protect their interests without the aid of the federal securities laws. Odom v. Slavik, 703 F.2d 212, 215 (6th Cir.1983). The partnership or venture interests are not investment contracts because the participants are not solely dependent on the effort of others for profits. In some instances, however, an apparent general partnership or joint venture interest may in fact be an investment contract.

Although the *Howey* test purports to require that anticipated profits be *solely* from the efforts of others, several courts have heeded the Supreme Court's directive in *United Housing Foundation Inc. v. Forman*, 421 U.S. 837, 95 S.Ct. 2051, 44 L.Ed.2d 621 (1975), to concentrate on economic realities and held that "solely" is not to be read strictly. *Odom v. Slavik*, 703 F.2d 212, 215 (6th Cir.1983); *Union Planters National Bank v. Commercial Credit Business Loans, Inc.*, 651 F.2d 1174, 1181 n. 9 (6th Cir.), *cert. denied*, 454 U.S. 1124, 102 S.Ct. 972, 71 L.Ed.2d 111 (1981) (recognizing this view among the circuits); *SEC v. Koscot Inter., Inc.*, 497 F.2d 473 (5th Cir.1974); *SEC v. Turner Enterprises, Inc.*, 474 F.2d 476 (9th Cir.), *cert. denied*, 414 U.S. 821, 94 S.Ct. 117, 38 L.Ed.2d 53 (1973). In the *Odom* case, this court affirmed the district court in its holding that, under the undisputed facts, the plaintiff partner's interest was not a security but recognized that a partner's or a joint venturer's interest may be a security under certain circumstances, quoting with approval from *Williamson v. Tucker*, 645 F.2d 404, 424 (5th Cir.), *cert. denied*, 454 U.S. 897, 102 S.Ct. 396, 70 L.Ed.2d 212 (1981), as follows:

> A general partnership or joint venture interest can be designated a security if the investor can establish, for example, that (1) an agreement among the parties leaves so little power in the hands of the partner or venturer that the arrangement in fact distributes power as would a limited partnership; or (2) the partner or venturer is so inexperienced and unknowledgeable in business affairs that he is incapable of intelligently exercising his partnership or venture powers; or (3) the partner or venturer is so dependent on some unique entrepreneurial or managerial ability of the promoter or manager that he cannot replace the manager of the enterprise or otherwise exercise meaningful partnership or venture powers.

703 F.2d at 215.

■ We find that there was adequate evidence to support the district court's holding that at least some of the investors were entirely passive and invested in the joint ventures in reasonable reliance on the expected efforts and expertise of the defendants. Therefore, the district court did not err in concluding that the joint ventures were investment contracts.

## ESCROW ACCOUNTS

■ We turn, finally, to the district court's conclusion that the units defendants sold in the escrow account were securities. Since they had voluntarily terminated the escrow account in December 1981, some four months prior to the district court's injunction, the defendants did not, in their appellate brief, contest the injunction as it applied to this account. In their reply brief, however, they maintain that the district court erred in holding that the units in the account were securities on the grounds that there was insufficient evidence before the district court for it to reach such a decision. We disagree and hold that there was sufficient evidence to support the district court's preliminary finding. This evidence included a Professional brochure promoting investment in the escrow account, and testimony by an SEC investigator that the funds of individual investors were commingled in a money market fund, thus supplying the horizontal commonality.

The defendants also claim that the escrow account was irrelevant to the district court's consideration of whether there was a substantial likelihood that the defendants would continue to engage in violations of the securities laws if not enjoined. They base this argument on the fact that the escrow account was already closed several months before the district court issued its injunction.

■ This court has previously held, however, that a defendant's past behavior is relevant to show that he may violate the securities laws in the future. In *SEC v. Washington County Utility District*, 676 F.2d 218 (6th Cir.1982), the court found:

> Proof of past violations of the securities laws serves as a basis for an inference

that future violations may occur. [citation omitted] As the frequency and magnitude of the past violations increase, the strength of the inference also increases.

*Id.* at 227. We find, therefore, that the district court properly considered the escrow account in determining the likelihood that defendants would continue to violate the securities laws.

### CONCLUSION

We determine, then, that the district court did not err in concluding that the investments offered and sold by the defendants were investment contracts and as such were securities regulated by the federal securities laws. This conclusion established that there was a substantial likelihood that the defendants would continue to violate the federal securities laws unless enjoined. We hold, therefore, that the district court did not abuse its discretion in issuing the preliminary injunction. The judgment of the district court is AFFIRMED.