William W. BAILEY, Jr., et al., Plaintiffs,

v.

J.W.K. PROPERTIES, INC., t/a Albemarle Farms, et al., Defendants.

Civ. A. No. 88–0014–C.

United States District Court, W.D. Virginia, Charlottesville Division.

Jan. 9, 1989.

James Robertson, Mindy H. Recht, Wilmer, Cutler & Pickering, Washington, D.C., D. Michael Atkins, McClure, Callaghan, Carter & Atkins, Charlottesville, Va., for plaintiffs.

John K. Taggart, III, M.E. Gibson, Jr., Smith, Taggart, Gibson & Albro, Charlottesville, Va., for defendants.

## MEMORANDUM OPINION

MICHAEL, District Judge.

This matter is presently before the court because of objections by plaintiffs to the report and recommendation submitted to this court by Magistrate B. Waugh Crigler on November 7, 1988. The objections having been filed in a timely and appropriate manner, this court is required to undertake a *de novo* determination of the matter. *Orpiano v. Johnson*, 687 F.2d 44, 48 (4th Cir.1982). Having reviewed the record *de novo*, plaintiffs' objections are denied and the report and its recommendations are adopted in their entirety for the reasons elaborated below.

### I.

This matter arose upon plaintiffs' claim that defendants' commercial dealings with them constituted a violation of federal security laws and state contractual law. The matter was before Magistrate Crigler on defendants' motion for summary judgment, seeking dismissal on the grounds that plaintiffs' claim failed to identify the colorable violation of federal securities law. In seeking to obtain summary judgment, defendants have argued that the commercial venture in question does not fit under the protective scheme of federal securities law and that, there being no viable federal question, the pendent state law claims ought also to be dismissed.

Magistrate Crigler found that the commercial venture in question did not qualify as a security for the purposes of 15 U.S.C. §§ 77(v) and 78aa. In reviewing the record of this case and assessing the analysis of Magistrate Crigler, this court is faced with two questions: First, does this court have subject matter jurisdiction? That is, are the transactions in question indeed securities? Second, are there material facts in dispute which would render this matter an inappropriate candidate for summary judgment? This court finds that the transactions in question do not qualify as "securities" under the controlling definition of the term, *Securities and Exchange Commission v. W.J. Howey, Co.*, 328 U.S. 293, 298–99, 66 S.Ct. 1100, 1103, 90 L.Ed. 1244 (1946), and further, with reference to what then becomes the dispositive jurisdictional issue, this court finds that there is not a genuine dispute about an issue of material fact relating to whether the characteristics of this transaction qualify as a security under *Howey*.

### II.

The initial recourse which any court must have in an inquiry such as this one is to the definition of an investment contract first spelled out by the Supreme Court in *Howey*. There, the Court held that in order for a venture to fit within the framework of the federal securities laws it must be "a contract, transaction, or scheme whereby a person invests his money in a common enterprise and is led to expect profits solely from the efforts of the promoter or a third party...." *Howey*, 328 U.S. at 298–99, 66 S.Ct. at 1103. Thus, *Howey* guides our analysis by identifying the three characteristics which such a venture must have: (1) the venture must represent a program, (2) there must be the requisite amount of commonality among the parties, and (3) there must be a certain "distancing" of the would-be investors from the sinews of the operation. That is, the participant in such an investment contract is not expected to be the hands-on manager of the program or operation. *Howey* itself speaks of this requirement in terms of the expectations of the investors that the success of their hopes lies largely in the immediate hands of others.[1]

The first two prongs of the *Howey* test need not long detain this court. The parties concede that this scheme qualifies as a program and it is clear that the evidence discloses vertical commonality among the

---

1. While *Howey* uses the language "is led to expect profits *solely* from the efforts of the promoter or a third party," 328 U.S. at 299, 66 S.Ct. at 1103 (emphasis added), it is fair to gloss this requirement with the adverb "largely" since the Fourth Circuit has so recently noted that "the term solely—used in *Howey*—must not be given a literal construction in all circumstances." *Rivanna Trawlers v. Thompson Trawlers*, 840 F.2d 236, 240 n. 4 (4th Cir.1988).

participants, even if the motivations of all the investors were not wholly congruent.

■ Thus, the crucial inquiry for this matter is whether the investment scheme in question meets the third prong of the *Howey* test. Were the investors dependent solely or largely on the efforts of promoters or third parties or did they possess rights which gave them a significant amount of control which they could exercise over the direction of the venture? In examining the management contract which structured the rights of the parties in this venture, the court finds that, while defendants retain a significant degree of control, plaintiffs possessed a panoply of rights far exceeding in scope those associated with the shareholder or investor in the classic securities arrangement. For example, the investors had the power to dispose of all or parts of their herds and to exercise control over practices of the defendants. Bailey deposition, exhibit # 2 at para. 4. Plaintiffs object that such control does not disqualify this scheme under the third prong of *Howey* since for example, plaintiffs could not choose the manager of the breeding program. Plaintiffs' objections to Magistrate's report and recommendation 18. However, this line of objection is inapposite, since the issue is not whether the plaintiffs controlled every detail of the breeding program, but whether the plaintiffs had a significant degree of control as opposed to an arrangement "[w]here the investors' duties were nominal and insignificant, their roles were perfunctory or ministerial, or they lacked any real control over the operation of the enterprise...." *Fargo Partners v. Dain Corp.*, 540 F.2d 912, 914–15 (8th Cir.1976). Likewise, when plaintiffs object that the arrangement ought to qualify as a security because, in part, the services the plaintiffs expected to be done on their own behalf were done, Plaintiffs' objections 19, the objection is beside the point since the dispositive issue is what control plaintiffs had and could have exercised.

In *Rivanna Trawlers v. Thompson Trawlers*, 840 F.2d 236 (4th Cir.1988), Justice Powell's explication of the third prong

in *Howey* is not merely controlling for this court, but it is also illuminating in the way that it clearly reveals that the venture in question cannot be considered a security. This court, of course, is well aware of the structural differences between the commercial venture described by Justice Powell and the venture in the present matter. However, this court finds quite persuasive and edifying Justice Powell's analysis of the test imposed by *Howey*'s third prong. That focus, simply put, is the issue of control. In describing why a general partnership ordinarily cannot qualify as a security, Justice Powell identifies "control [by the investors] over significant decisions of the enterprise" as the key difference. *Id.* at 240.

It is essential to note that this inquiry is not about whether the investors actually exercised control over the venture, believed that they exercised control over the venture, or, even, *should have* believed that they exercised control. Instead, Justice Powell mandates a thoroughly objective inquiry. Therefore, this court must look to see simply if actual control existed. Merely because the investors chose not to exercise control or because they, perhaps culpably, misunderstood the degree of control which they in fact objectively possessed, does not serve to convert their venture to a security under the third prong of the *Howey* test. As Justice Powell noted, "The mere choice by a partner to remain passive is not sufficient to create a security interest." *Id.* at 240–41. The investors may well have chosen either to sleep on or to underutilize the bundle of rights which the management agreement gave them. That, however, does not undercut the number or strength of the rods which composed their bundle of rights.

■ In this connection, the court must take strong exception to the "parade of horribles" offered by the plaintiffs as an alleged result of the analysis employed by Magistrate Crigler. In disagreeing with Magistrate Crigler's (and, in this court's view, *Rivanna Trawlers'*) reading of the *Howey* test, plaintiffs assert that "To adopt the Magistrate's reading ... would lead to

easy evasion of the security laws by not even requiring but merely permitting an investor to contribute a modicum of effort." Plaintiffs' objections 19, fn. 7. The third prong of the *Howey* test, as interpreted in *Rivanna Trawlers* and as utilized by Magistrate Crigler, is essentially an objective test, inquiring into whether the requisite amount of control was present for the investors. On the contrary, plaintiffs seems to be suggesting a subjective test, which would be infinitely less certain in administration and would seem to ask merely whether investors *believed* they had a certain amount of control. A subjective interpretation of the third prong of the *Howey* test would allow the answer as to whether or not a security existed to depend not upon the actual rights and powers enumerated in the instrument, but merely upon what the investors reasonably believed they were doing. If such a test were to become the standard, one could even foresee scenarios where differing groups of investors in a common scheme could, with varying degrees of plausibility, claim different types of status based on differing, if possibly reasonable, sets of beliefs and expectations.

### III.

Of course, in passing on a summary judgment motion, this court must view the evidence in the light most favorable to the non-movant and must find that there is no genuine issue of material fact. Fed.R.Civ. P. 56(c); *Celotex v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986). In order to survive the motion for summary judgment, plaintiffs must produce "specific facts showing there is a *genuine issue for trial.*" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986), citing Fed.R.Civ.P. 56(e) (emphasis in original). Plaintiffs needed to show there was a factual controversy within the bounds of the dispositive legal issue, i.e., whether the venture in question qualified as a security under the *Howey* framework. Merely because plaintiffs can point to other issues in controversy or dispute between them and the defendants does not permit them to survive the motion for summary judgment. If the commercial venture in question cannot qualify as a security under the applicable federal law, then there is no federal jurisdiction and that determination alone is sufficient to be dispositive of the plaintiffs' claims. This court finds that there is no genuine dispute about a material issue or fact relating to the status as a security of the management agreement between plaintiffs and defendants. That is, plaintiffs were able to point to no facts which showed that they did not possess the degree of control which disqualified their claim under the third prong of the *Howey* test.

### IV.

In finding that the commercial venture in question does not qualify as a security under federal law, this court notes that it is not necessary to reach the merits of plaintiffs' remaining pendent state claims. Therefore, plaintiffs' state law claims are dismissed without adjudication on the merits of those claims. *United Mine Workers of America v. Gibbs*, 383 U.S. 715, 726, 86 S.Ct. 1130, 1139, 16 L.Ed.2d 218 (1966); *Coastal Neuro–Psychiatric Assoc., P.A. v. Onslow Memorial Hospital, Inc.*, 795 F.2d 340, 342 (4th Cir.1986).

The court also takes note that defendants filed "exceptions" to the report and recommendation issued by Magistrate Crigler. Aside from one apparent typographical error, the exceptions all deal with the report's characterization of the factual record before the court. Given this court's analysis of the matter before it, defendants' exceptions are *de minimis* and thus do not affect disposition of the matter.

### V. CONCLUSION

This court grants defendants' motion for summary judgment and adopts the report and recommendation of Magistrate Crigler in its entirety. The court dismisses plaintiffs' claims under federal securities law for lack of subject matter jurisdiction and dismisses the pendent state law claims without passing upon their merits.

An appropriate Order shall this day issue.

### ORDER

On May 24, 1988, this court entered an Order referring this case to the Honorable B. Waugh Crigler, United States Magistrate, for proposed findings of fact and a recommended disposition. The Magistrate filed his Report and Recommendation on November 7, 1988. On November 23, 1988, plaintiffs filed Objections to the Report and Recommendation. For reasons stated in an accompanying Memorandum Opinion, it is this day

### ADJUDGED AND ORDERED

as follows:

1. Plaintiffs' Objections to the Report and Recommendation of the United States Magistrate are overruled, and said Report, filed November 7, 1988, shall be, and it hereby is, adopted in its entirety.

2. Defendants' motion for summary judgment shall be, and it hereby is, granted.

3. Plaintiffs' federal claims shall be, and hereby are, dismissed with prejudice and plaintiffs' pendent state claims shall be, and hereby are, dismissed without prejudice.

4. This action shall be, and it hereby is, stricken from the docket of this court.

### REPORT AND RECOMMENDATION

B. WAUGH CRIGLER, United States Magistrate.

This action is before the court pursuant to 28 U.S.C. § 636(b)(1)(B) to render a report setting forth appropriate findings, conclusions and recommendations for the disposition of certain outstanding dispositive motions. In consequence of proceedings conducted before this court on September 19, 1988 and having reviewed all evidence proffered in favor of or in opposition to the dispositive motions, this court hereby renders its report.

### A. STATEMENT OF THE RECORD

Plaintiffs, all citizens and residents of Albemarle County, Virginia,[1] filed an action against J.W.K. Properties, Inc., a Delaware corporation, trading as Albemarle Farms (Albemarle Farms or sometimes Albemarle), and John W. Kluge (Kluge), also a citizen and resident of Albemarle County, Virginia. The plaintiffs allege that the court has federal question jurisdiction pursuant to 15 U.S.C. §§ 77(v) and 78(a)(a) [78aa] and 28 U.S.C. § 1331, and that there is pendent jurisdiction over their state law claims. These claims arose out of a series of transactions wherein plaintiffs purchased into a Simbrah cattle embryo transplant, maintenance and marketing program allegedly offered and sold by the defendants. The first four counts of the complaint allege violations by the defendants of the federal securities laws, and the balance of the counts seek relief on associated state law grounds.

On March 31, 1988, defendants responded to the plaintiffs' complaint by filing a motion to dismiss or for summary judgment pursuant to Rule 12(b) of the Fed.R. Civ.P. Defendants sought dismissal on the grounds that the complaint failed to state a claim under the federal securities laws, that the court lacked jurisdiction over the state claims and that the claims of the plaintiffs Michael A. Cates and David D. Marshall were barred under terms of certain releases that each of them executed in favor of the defendants. Alternatively, the defendants moved for entry of summary judgment on the grounds that there are no genuine issues of material fact and that the defendants are entitled to judgment as a matter of law. In support of this alternative motion, defendants submitted a memorandum together with an affidavit of James G. Nash, DDM.

---

1. The court has been informed that David D. Marshall, one of the plaintiffs, recently has been killed in an airplane accident. For purposes of this report, Mr. Marshall's claim shall be treated as if a motion for substitution has been made and the proper parties substituted pursuant to Rule 25 of the Fed.R.Civ.P.

On April 29, 1988, defendants filed a motion both for a protective order and for an order limiting the scope of discovery, contending, in pertinent part, that until the issue of the court's subject matter jurisdiction was decided, full discovery pursuant to the rules of procedure should not be permitted. They also suggested that the court should limit discovery to the issues raised by their alternative motion to dismiss or for summary judgment. On June 9, 1988, this court entered an order granting the defendants' motion for a protective order, limiting the scope of discovery within the parameters fixed by defendants alternative motion. It also scheduled the action for a hearing on all outstanding dispositive motions for September 19, 1988. Between the date of the entry of that order and the hearing date, substantial discovery was conducted pursuant to the court's order, the fruits of which are before the court either in the form of affidavits, depositions or other evidence both in support of and in opposition to the defendants' motion. Discovery was limited, however, to the issues fixed by the court.

## B. ISSUES PRESENTED

The original motion filed by defendants attacks the subject matter jurisdiction of the court on the grounds that the financial transactions which are the subject of this action are not securities within the meaning of the Securities Act of 1933, 15 U.S.C. §§ 77(v) and 77(a)(a) [78aa]. In addition, defendants assert that the claims of plaintiffs' Cates and Marshall are barred, as a matter of law, by releases executed in favor of the defendants. In what can be considered an amended motion to dismiss, defendants also raise limitation of action defenses to all of the plaintiffs' claims.

Plaintiffs, on the other hand, contend that there are genuine issues of material fact concerning whether the transactions which are the subject of this action were securities for purposes of subject matter jurisdiction. In addition they object to the timeliness of defendants' motion based on certain statutes of limitations, contending that, in any event, genuine issues of material fact on the limitations of action ques-

tions have been raised by an amended complaint filed in open court on September 19, 1988. With respect to the questions concerning the releases executed by plaintiffs Marshall and Cates, those plaintiffs also assert that there are genuine issues of material fact as to whether the releases were signed under circumstances constituting duress, thereby rendering such releases unenforceable. Plaintiffs finally assert that if genuine issues of material issue exist on the federal question claims, the court should exercise its discretion to retain and adjudicate their pendent state law claims.

## C. PROCEDURAL POSTURE OF THE CASE

Subject matter jurisdiction of the federal court cannot be waived, and it may be raised at any time, even on appeal. See e.g. Fed.R.Civ.P. 12(h)(3); *Owen Equipment and Erection Co. v. Kroger*, 437 U.S. 365 [98 S.Ct. 2396, 57 L.Ed.2d 274] (1978); *American Fire & Casualty Co. v. Finn*, 341 U.S. 6 [71 S.Ct. 534, 95 L.Ed. 702] (1951). Ordinarily, subject matter jurisdiction is raised by a Rule 12 motion, which, in itself, may precipitate plenary proceedings to decide any mixed questions of law and fact. If such a motion is sustained, the case ordinarily would be dismissed for want of jurisdiction prior to reaching any decision on the merits of the claim(s).

However, when subject matter jurisdiction is an element of a plaintiff's federal claim, the court should entertain jurisdiction and decide the jurisdictional issue as though that issue were the basis of a motion to dismiss for failure to state a claim. If evidence is submitted in support of or in opposition thereto, the court may treat the motion as one for summary judgment. Fed.R.Civ.P. 12 and 56. As the Fourth Circuit instructs in its recently decided case of *Rivanna Trawlers v. Thompson Trawlers Inc.*, 840 F.2d 236 (4th Cir.1988), the issue of jurisdiction must be decided as an element of the claim and considered on its merits. Accordingly, in order to resolve the issues presented by the defendants' motions, the court must consider whether

there is any genuine issue of material fact and, if not, whether the moving party is entitled to judgment as a matter of law. *Rivanna Trawlers*, 840 F.2d at 239–240; *see also Anderson v. Liberty Lobby Inc.,* 477 U.S. 242 [106 S.Ct. 2505, 91 L.Ed.2d 202] (1986). The party against whom summary judgment is sought may not rest upon mere allegations in the pleadings, but is required to set forth specific facts showing that there are genuine issues of material fact for trial. *Celotex v. Catrett,* 477 U.S. 317 [106 S.Ct. 2548, 91 L.Ed.2d 265] (1986); *Anderson v. Liberty Lobby Inc., supra.*

In that regard the parties have referred to various documents, depositions and affidavits either in support of or in opposition to the motion. The court believes that it should first address whether genuine issues of material fact exist in that evidence, because if none exist and if defendants are entitled to summary judgment on the federal question, the court should go no further to decide substantive issues that more appropriately belong in another forum. Of course, if there are genuine issues of material fact, judicial expediency would dictate further proceedings in this court on all claims and defenses that arise out of the transactions that are the subject of this case.

## FACTUAL BACKGROUND

This action has its genesis in the development of Albemarle Farms by defendant, Kluge, into a recognized operation for the breeding and raising of purebred beef cattle. It is undisputed that some two years prior to the time when the transactions in question first were negotiated, Albemarle Farms acquired an ongoing cattle operation specializing in the Semmental breed. In 1983, Albemarle hired Drew Daniels, a recognized expert in breeding and raising Semmental cattle, as "cattle manager," with a charge from Kluge to develop "the best herd in the country in five years." Daniels Deposition at 47. Consistent there-

with, the physical facilities at Albemarle Farms were improved, and Daniel was given a great deal of purchasing power to acquire breeding stock. In his own words, he was not "tied to a budget." *Id.* at 56.

According to Daniels, the Semmental operation at Albemarle Farm became virtually self-contained. With the exception of engaging a specialist to collect, freeze or implant embryos, all other aspects of the breeding business were "done right there" on the farm. *Id.* at 66. Albemarle also raised and maintained its herd, selling off the "culls" either to other breeders for breeding stock or in the market for beef.[2] The evidence shows that Albemarle had reached the point where it could actively market bull semen, but it was not actively marketing embryos. *Id.* at 68.

In 1984, Daniels recommended that Albemarle engage in breeding Simbrah cattle, a cross between Semmental and Brahmin. The growth rate for such a breed "was ... tremendous" and the breed reputedly produced leaner, "light and lively" beef. See, e.g. *Id.* at 68, 100–101. Defendant Kluge became "excited" about the prospects of such breeding, and he permitted Daniels to embark on a cross breeding program that eventually would produce offspring possessing the sought after pure bred proportions of Semmental to Brahmin. According to Daniels, by 1985 such cross breeding had produced sufficiently both in numbers and quality that defendant Kluge authorized Daniels to explore the commercial aspects of the operation. *Id.* at 71–73.

Daniel contacted Johnny Joyce of Joyce Genetics, a recognized breeding specialist in Texas, to discuss Joyce's handling an embryo program for Albemarle (*Id.* at 72). As a result, a presentation by Joyce was planned so that "Johnny could present his program and we could let people know what Albemarle Farms was doing." (*Id.* at 73). All of the discovery evidence before this court reveals that in November 1985 Albemarle did, in fact, sponsor an invitation-only event both to display its cattle

---

**2.** This process of selection is called "culling." The more genetically pure animals are retained for embryo or semen production with the weak-er ones sold for common breeding or for slaughter. Daniels Deposition at 67.

operation and to provide a forum for Joyce's presentation of his company's breeding program to the invited guests. A number of business and professional people attended the event either out of curiosity about defendant Kluge's activities in that portion of Albemarle County, or out of purely economic interests, or both. Among those in attendance were some of the plaintiffs. The evidence shows that the accountant for plaintiff Wood also was in attendance.

Irrespective of how each plaintiff individually may have perceived the significance of the events at that function, or what their individual motivations for attendance may have been, it is uncontroverted that Mrs. Kluge[3] had instructed Joyce to make no attempts to sell his program to the guests in attendance. After the Joyce presentation and probably as a result thereof, Kluge caused the Albemarle personnel, both professional and managerial, to develop a program that was less costly per embryo than that of Joyce Genetics. This program was to be marketed and managed by Albemarle Farms, itself. *Id.* at 74–90. This was done, and once defendant Kluge approved the program developed by his people, marketing of it by Daniels and others commenced.

Thus, the court is brought to the more immediate circumstances leading to the transactions which are the subject of this suit, circumstances each side argue in support of their respective positions on the question of whether there exist any genuine issues of material fact.

The means by which the plaintiffs were introduced to the program Albemarle Farms was offering, as well as the actual details of each plaintiff's entry into the program, vary. David Marshall, in a deposition taken prior to his death, revealed that in December, 1985, his brother Forrest R. Marshall, Jr. advised him of the program's availability and suggested that he contact Drew Daniels. Marshall Deposition at 1–2. Mr. Marshall, his wife, Daniels

and one of Daniels' assistants met in late 1985, at which time the program was explained. *Id.* at 3. Marshall and his wife then discussed it, having been "impressed" with Daniels' credentials and having "figured everything I had read about Mr. Kluge, it was very successful, I figured I was investing in someone that didn't need my money to make a program go." *Id.* at 4. Marshall further revealed that he was "looking for an investment," that he possessed neither the means nor the knowledge to manage cattle and that he and his wife decided to invest upon Daniels' representations both that Albemarle Farms would manage and market the cattle and that Kluge would "stand behind" the program so "[N]o one would lose any money." *Id.* at 4–5.

Marshall further testified that on December 31, 1985 he delivered a check in the amount of $25,000.00 to Albemarle Farms for what a copy of the check reveals was the purchase of the "embryo package." Marshall Deposition Exh. # 2 at A00011. Contemporaneously, Marshall executed an Agreement to Purchase Simmental and/or Simbrah Embryos (Embryo Agreement) and a Management Contract of even date. *Id.* at 5–6, Exh. #'s 1 and 2. While these documents contained the written terms of the parties' agreement, Marshall further believed that Daniels had "implied" that the Kluges (i.e. Mr. and Mrs. Kluge) would "back this program a hundred percent and were going to see that no one was going to lose any money ..." *Id.* at 7.

Marshall also testified that aside from his initial participation in purchasing the program in December 1985, the bulk of his involvement in the program thereafter was to inquire and/or complain both about the lack of data being furnished him concerning the birth and progress of his animals on the one hand and, on the other, the method of marketing that was to be employed. *Id.* at 13–15, 16–17. In addition, he visited the premises on at least one occasion. He found that his animals were

3. Though Mrs. Kluge is not a party hereto, the deposition evidence clearly shows that she actively participated in Albemarle's operations, including negotiations leading to the development of its cattle embryo transplant, breeding and cattle management programs.

both alive and that they "looked healthy." *Id.* at 15.

Upon termination of its participation in the program by Albemarle Farms, Marshall stated he signed a document releasing Albemarle from liability Marshall Deposition Exh # 3 only because he was told by Albemarle's personnel that neither his cattle would be released to him nor would they be registered unless the release document was executed. *Id.* at 9–10. Marshall further revealed that at no time did he consult available counsel before executing the release, and that both registration was carried out and the animals were made available to him once the release document was returned to Albemarle Farms. *Id.* at 11–12.

Plaintiff, Michael A. Cates, was one of the plaintiffs who attended the Joyce Genetics presentation. Cates Deposition at 41–42. Cates' interest in the overall program was twofold. Because of his professional training in gynecology and obstetrics, he had a personal interest in such a program. *Id.* at 19–20. Equally, however, the tax advantages of what would later be sold as the Albemarle Farms program,[4] his knowledge of the "upside potential" for profit and his observations of Albemarle Farms' facilities and existing herd qualities gave him financial incentives to purchase into the program. *Id.* at 42–43.

Cates testified that he knew that the embryo purchase was just the beginning of a long term process, and that there were risks associated with entry into such programs. *Id.* at 42. According to Cates, profitability depended on the animals themselves, and the quality of management. *Id.* at 62. Nevertheless, it was Cates' view that the Joyce program was "too expensive." *Id.* at 61.

Thereafter, when Cates learned that the Kluges "were thinking about getting a program up ...," he discussed the matter with Daniels at an Albemarle Farm Christmas party. *Id.* at 62–63. This program was to be less expensive than Joyce's and would not require a purchase of as large a minimum of embryos. In addition, Cates was advised that "they (Albemarle Farms) would raise them (the animals) for us and, you know, manage them and then they would take care of distribution." *Id.* at 63.

Mr. and Mrs. Cates attended another program-related meeting with Daniels soon thereafter. There, the program was discussed in somewhat greater detail. *Id.* at 64–65. The only guarantee discussed at that time related to the risk of abortion within 90 days. *Id.* at 64. In any event, the Cates indicated their desire to purchase into the program, and several days later Daniels and Forrest Marshall came to them with the contract documents. It is important to note here that Forrest Marshall, an individual unconnected with Albemarle Farms and the brother of plaintiff, David Marshall, mentioned to Cates that there were other " 'bigger investors,' " and that Kluge "was going to see it (the program) though" *Id.* at 65 Cates agreed with Marshall that "it seem[ed] like a pretty good deal ..." *Id.* He then reviewed the contract documents with Daniels and received assurances from Daniels that the defendants would not only make management decisions for him but also would "tell [him] along the way what was happening ..." *Id.* Cates signed the contract and passed Daniels a check December 30, 1985. *Id.* at 67.

Cates further revealed that the only aspect of the program that he personally investigated was the representation that the purchase would be "write-off that year." *Id.* at 70. He never voiced any objection to any provision of the written agreements, even after they were returned to him sometime later. *Id.* at 69. In late 1986 or early 1987 Mr. Daniels was replaced by Dr. Nash as manager of Albemarle Farms *Id.* at 74. No where does it appear that Cates expressed any objection to such change in management, an area of the operation he considered significant.

---

4. Cates testified that he took a $12,000.00 deduction for his initial $25,000 investment for the 1985 tax year. Cates Deposition at 21.

Unquestionably, the gravamen of Cates' claims as well as that of the other plaintiffs was the defendants' early termination of the program's management. Cates testified that part of the basis of his entry into the transaction was both Albemarle Farms' management of the program and the representations by Albemarle Farms personnel that defendant, Kluge, was behind the program and

"that none of the investors would lose any money on the deal, that he (Kluge) wanted them all to make money on this, he (Kluge) was interested in promoting some kind of good relationship with the community." *Id.* at 79.

When pressed, Cates recognized that, under the circumstances, both Kluge or Albemarle Farms, on the one hand, and the investors, on the other, could suffer a loss if the program were terminated. *Id.* at 83. However, Cates revealed that without the commitment by Mr. and Mrs. Kluge to "see it (the program) through" as represented to him by Daniels, "I would not have gotten involved in this thing." *Id.* at 84.

Regarding actions taken post termination, Cates stated that a release was delivered to him in May 1987, and that he held it for "two or three months" before signing it. *Id.* at 89. During that period, he had discussions with Dr. Nash, but he did not discuss the matter with his own attorney. *Id.* at 90. Cates revealed that though Dr. Nash had made signing the release a pre-condition for the removal of Cates' animals and as well as for their registration, Cates secured possession of the animals without executing the release because of "a mistake on their part." *Id.* Upon signing the release, the animals were registered.

Since then, Cates has sold some of the animals but has bred one of his "better" bulls "to about twenty Simbrah heifers." *Id.* at 91. He also has "about sixteen calves on the ground." *Id.* Drew Daniels' parents are caring for Cates' animals at the present. Because Albemarle Farms' management and marketing are not being utilized, other marketing avenues must be explored. *Id.* at 95–98.

William Bailey also attended the function in November 1985 at Albemarle Farms during which the Joyce program was presented Bailey Deposition at 26–30. Bailey remembered that at that function he heard both Drew Daniels and Mr. Kluge discussing Kluge's commitment to his involvement in such a program, specifically that "when Mr. Kluge got behind the program he could and would make it work." *Id.* at 29.

Bailey participated in another meeting with Daniels closer to Christmas, a meeting at which Forrest Marshall also was present. *Id.* at 30. During this meeting, Daniels explained how the program would work, its costs and how participation in it could be financed. *Id.* at 31–32. However, Bailey did not enter the program at that time.

Thereafter, Bailey had several contacts with Daniels, who at that time was attempting to find purchasers before the end of the year. *Id.* at 92. During this period, efforts were being made to solicit the participation of plaintiff Curtis. Both Bailey and Daniels tried to make contact with Curtis, and, eventually, both Curtis and Bailey met at Albemarle Farms on December 31, 1985 with Daniels, another Albemarle Farms employee and Mr. Kluge. *Id.* at 34.

The benefits of the Albemarle Farm program were touted at that time. Among those benefits were Albemarle's expertise, the expectations of the breed's performance and both Kluge's support of the program and his "connections to market it." *Id.* at 35. It was at this meeting that Bailey purchased into the program by delivering a check for $50,000. However, he did not secure and execute the contract documents until the early part of January 1986. *Id.* at 36–37. Those documents, according to Bailey, were "basically the support documents, supposedly to backup [sic] what they were selling." *Id.* at 37. Bailey also believed that the final "agreement" or contract encompassed "all the stuff that was told me" which could not be embodied in written form." *Id.* Nevertheless, Bailey considered the written documents to have been that which "generally put in

place what was agreed upon." *Id.* at 38. Essentially, Bailey felt he had purchased "a program" wherein Albemarle Farms would raise and maintain the animals, select the breedable bulls and donor cows through the culling process and conduct a promotional and marketing effort, all for the purpose of developing "a whole breed." *Id.* at 38–42. Bailey further stated that it was Kluge's professed "commitment to it ... [that] ... made it real ..." and that it was "pretty hard to argue when you are sitting there talking to, ..., you know when you are a country boy from Albemarle County, to sit there and talk to the second richest guy in the country ... its awfully hard not to believe him when he says we are going to do this ... that or the other." *Id.* at 43.

Bailey could not recall whether he read the contract documents in their entirety prior to executing them but admitted that such provided him, as a buyer, with the "right to go out (to the farm) and say no, don't do A, I want to do B". *Id.* at 60–62. He further stated that in "a couple instances" he voiced objections to the method or the manner of certain operations, and he specifically sought clarification of the events surrounding the replacement of Daniels by Dr. Nash. *Id.* at 63–65. He also appears to have had a continuing complaint concerning Albemarle's failure to keep him informed about "what was going on" both with respect to his animals and with respect to its maintenance charges. *Id.* at 65. Nevertheless, he was not "overly concerned" about the operation and believed he "was in good hands." *Id.*

There is little or no evidence in the record concerning the eventual disposition of Bailey's animals once Albemarle Farms gave notice of its ceasing "the program as it was structured." *Id.* at 98. According to Bailey, Albemarle's personnel offered to value the animals and "get back to us as to how to dispense with them." *Id.* At that point, Bailey's options were to "evaluate" and "liquidate." *Id.* at 99. By July 24, 1987 Bailey advised Albemarle that he had

"arranged to have my cattle moved away by Mr. Joe Black," and that he expected Albemarle Farms' cooperation. *Id.* at Exh. #7, p. D00065. What occurred after that cannot be gleaned from the record.

Plaintiff Thomas Curtis became aware of the defendants' program when he was introduced to Drew Daniels by plaintiff Bailey.[5] Curtis Deposition at 47. Bailey apparently had suggested that Curtis take "a look" at the embryo program. *Id.* at 48. A "combination" of meetings took place in December, one of which involved Daniels and Kluge. *Id.*

The first meeting occurred at Albemarle Farms where Daniels took Curtis on a tour and "told me about their expectations in the Simbrah line." *Id.* at 52. Daniels also explained the Kluge's "personal commitment" to the embryo program and suggested that "it might be helpful" to Curtis in his "Keswick project if ... [he] got to know ..." the Kluges. *Id.* No other specific information was given to Curtis at that time.

Thereafter, Curtis had conversations with Bailey and Daniels eventually leading to a meeting with Daniels and Kluge on the 31st of December 1985. Bailey had convinced Curtis that the "Kluges were here to stay and that gave me some roots of confidence that he (Kluge) did intend to fulfill what he was out to do ..." *Id.* at 54. Curtis also had been informed about the nature of the operation as well as the benefits of being among the "first group that bought some embryo." *Id.* at 55. On December 31, 1985 Curtis attended a meeting at Albemarle Farms also attended by Kluge, Daniels and Bailey. The program was outlined, during which presentation Kluge stated that "it will probably be one of the best investments you got yourself into." *Id.* at 60. According to Curtis, Kluge also touted the quality of the beef that was to be produced as well as the marketing avenues that were being explored.

---

5. Bailey's real estate company was the agent for Curtis' development of the old Keswick Country Club. *Id.* at 49.

Curtis, likewise, spoke to Kluge about his Keswick development and advised Kluge of corporate memberships that were available for Kluge's company, Metromedia. *Id.* at 60–61. In addition, Curtis sought a potential "backup" loan source for the Keswick development "and he (Kluge) recommended that I go to Manufacturer's Hanover." *Id.* at 61. Later Kluge arranged an appointment for Curtis with the president of that bank. *Id.*

On December 31, 1985, Curtis purchased into the program, tendering his $50,000.00 check.[6] *Id.* at 37, 68. However, nothing but the check was signed that day. *Id.* at 62. Curtis received a package of materials in January, and included among them were the contract documents which Curtis signed and returned to Albemarle either directly or indirectly through Bailey. *Id.* at 63–64.

Curtis further testified that the agreement he had with Albemarle Farms was based both on "what was written" and on his perception of the premises made in the oral conversations he had concerning the "onging oepration" and "how they were doing things." *Id.* at 103. Curtis fully understood that each investor would own the embryos purchased as well as the calves that such embryos would produce. No investor jointly held an undivided interest in each animal, though Curtis believed all investors had "the same purpose" for their investment. *Id.* at 29. All cattle were individually tagged and separately identifiable. *Id.* at 30. Each purchaser/owner had the right to sell, liquidate or otherwise remove an animal from the herd.[7] *Id.* at 30–31. Curtis believed that the program was a common enterprise because: a) there would be cross breeding among individual animals in the herd as a whole; and b) the purpose of the program was shared by those investing in it. *Id.* at 28–30. Nevertheless, this plaintiff's confidence in the program "lay in Albemarle

Farms and John Kluge, not some other operation ..." *Id.* at 99.

In many respects the deposition of Wendell Wood reveals facts similar to those presented in the depositions of the other plaintiffs. However, in Wood's case, the underlying transactions took on a unique character. Like Cates and Bailey, Wood attended the November, 1985 fete at Albemarle Farms during which the Joyce program was presented. Wood Deposition at 68–71. According to the evidence, Wood believed he attended that event as a guest of his accountant, David Wheeler, who had received an invitation. Wheeler Dep. at 26–28. At that time Wood listened to the presentation, received a Joyce prospectus, possibly with other brochures, and turned them over to Mr. Wheeler for his review. Wood Deposition at 70–71). Like the other plaintiffs, Wood had no further dealings with Joyce after the November 1985 presentation.

The breeding program, nonetheless, interested Wood, but "[M]entally I had not made up my mind yet to do it." *Id.* at 72. More phone calls between Albemarle personnel and Wood followed, and "in every phone call it was like a new development had happened that was making the thing better." *Id.* By that time Wood understood that there was a minimum purchase of ten (10) embryos (one unit), that there were certain tax incentives built into the purchase (though he believed the benefit to him was minimal), that the defendant Kluge was involved to an extent that he would "make it (the program) work" and that the enterprise "could be quite a great venture." *Id.* at 73–74. Wood's interest finally grew to the point that a meeting with Mr. Kluge was arranged for December 31, 1985. *Id.* at 75.

At that meeting Wood purchased sixteen (16) units, which coincided with the number of units remaining available in the original offering. *Id.* at 76. Wood, Wheeler and Daniels actually had met earlier in the day

---

6. There is evidence that Curtis offered to purchase $500,000.00 worth of embryos, but that Albemarle Farms was not offering such a quantity to him at that time in view of the purchases

by other investors. Daniels Deposition at 24, Curtis Deposition at 67.

7. Curtis never "tested" his right to remove, sell or liquidate any animal. *Id.* at 31.

and "explored" whether Kluge would finance the purchase, but Wood was advised that even though, for tax reasons, a cash transaction would be required before the end of the 1985 calendar year, an additional offering was expected to be made available in 1986 *Id.* at 78–79. While Wood had sufficient cash reserves to purchase the 16 units ($400,000.00), and while he purchased his units that day with a combination of wired funds and a personal check, he also negotiated an "unrelated venture" with Kluge whereby Wood's wholly owned corporation borrowed some One Million Dollars ($1,000,000) from Kluge to be secured by a deed of trust on land the corporation held in Albemarle County. *Id.* at 80–82. That loan transaction closed some 60 days later. According to Wood, this financing plan was utilized in lieu of one that was available to embryo purchasers through the Jefferson National Bank[8] and was a method by which Wood could maintain liquidity for his wholly owned corporation in view of his personal expenditure in the instant venture. *Id.* at 83–87. John Kluge, therefore, indirectly became "the banker." *Id.* at 84.

According to Wood, he delivered the $400,000.00 in funds to defendants on December 31, 1985 so that "[I]t gave me a purchase in that year for whatever extent that it was good for me ..." with the understanding that the "paperwork" was to follow. *Id.* at 90. Wood did not execute either the embryo purchase or the maintenance/marketing agreements until "[S]ometime in January of '86." *Id.* at 91. Nevertheless, when he did receive them, the documents were read and signed without objection. *Id.* at 92, 94.

There was more to Wood's agreement with defendants than was contained in the written documents, more even than contained in what the other plaintiffs maintain

their investment contracts to be. According to Wood, he believed he already had an agreement with the defendants before the written documents were signed. *Id.* at 93. Additional "promises" were made which the "contract did not speak to" including the following: (a) that after weaning, Wood's animals were to be placed in his farm to pasture there;[9] b) defendants would produce sufficient grain to sustain the operation; and c) defendant Kluge promised "to make sure that Wendell [didn't] get hurt in this transaction." *Id.* at 99. While the "paperwork" was a part of the transaction, to Wood, "the man behind the paperwork [was] more important than the paperwork." *Id.* at 101. In summary, Wood "didn't care if [he] ever saw a contract," because he believed what he "had been told." *Id.* at 104–105.

In March, 1987, Wood was advised that defendants had made a decision that "the program was no longer economically viable" because "the tax laws had changed." See, e.g. *Id.* at 118. Prior to this, however, Wood had secured delivery of his herd to his farm, though the transfer of the animals had taken place under a cloud of disagreement over the fees owed by Wood for interim maintenance. *Id.* at 129–132, *see also* Wood Deposition, Exhibit #4. Wood's hired personnel assisted in the transfer, a transfer Wood thought was long overdue and one he had been requesting since August 1986. *Id.* at 134–136.

Upon termination of Albemarle Farms' involvement in the program, Wood received from defendants' representatives a valuation of his animals, an offer to purchase his bulls and an offer to include his herd among the animals Albermarle Farms intended to market in its efforts to reduce its own herd. Wood Deposition, Exhibit #'s 5, 6. Wood advised defendant that he was not interested in the offers to purchase and

---

**8.** The evidence shows that officials from Jefferson National attended the Joyce presentation and had agreed to offer loans to potential buyers that otherwise met the bank's lending requirements. Daniels Deposition at 212–213.

**9.** Wood testified that his farm was close to Daniels' office, that at the time he grazed no animals on his farm, that there was no reason to pay for

pasture when he could provide it. Simply put, he bargained for and obtained an agreement have possession of his animals. *Id.* at 30, 32, 98. The evidence also reveals that Wood's cattle, in fact, were moved to his premises for they were on his premises when the program was terminated. *Id.* at 15, 21, 22, 129, 130, 134, 141–142.

for marketing as such were then presented. Wood Deposition at 140. Instead, he sought a continuation of the program in order to "take our chances to do the program the way it was supposed to have been done." *Id.*

Before turning to an analysis of the issues in this case, the court also takes note of certain uncontested biographical facts that have been suggested as factors for the court to consider in arriving at its conclusions. All of the plaintiffs are experienced business or professional people who had reached a level of success that afforded them threshold economic qualifications to be included among those either invited to the November 1985 event at Albemarle or otherwise exposed to the program in the first instance.[10] At least three of the plaintiffs have extensive experience in the field of real estate acquisition, development and sales, and the testimony of Cates and Marshall undeniably indicates their familiarity with significant business ventures. In addition, each plaintiff personally negotiated his investment in the program, none seeking advice of available counsel, though at least two consulted with accounts relative to the tax implications of the transaction prior to becoming involved. None of the plaintiffs profess any knowledge or expertise that in their view would be necessary to the effective breeding, raising, maintaining, or marketing of Simbrah cattle, though it is undisputed that Curtis has horse farming experience and Wood operated a nearby farm on which his animals eventually were kept.

Drew Daniels, on whose deposition both sides rely, controverted plaintiffs' almost uniform testimony that he and John Kluge told the investors that "they would not lose any money" in the venture. Daniels Deposition at 11, *see also Id.* at 23. In addition, he denied that anyone on behalf of the defendants, at least in his presence, made any commitments to the program for an indefinite period of time. (*Id.* at 12). Daniels also stated that there were other comparable services available in the field,

though not in the state, both for management of a Simbrah herd and for marketing the products of the investment. *Id.* at 12–15.

Daniels also controverted Wood's testimony concerning the details of his purchase, indicating that Wood initially purchased two units at his home on the afternoon of December 31, 1985 but then called Daniels later on New Year's Eve to inquire about purchasing additional units before the close of the tax year because "his (Wood's) tax bill was bigger than he thought …" *Id.* at 16. Furthermore, Daniels testified that Wood, in fact, signed the contract documents on December 31, 1985. *Id.* at 18–19.

Daniels also stated that the Kluges had entered the Simbrah venture with the intent to make long-term profits, and that each individual invited to be in the program was fully informed of the competitive nature of the enterprise and its risks, and that each was advised to consult their own accountants and "legal advisors" before becoming an investor. *Id.* at 25, 144, 203–206.

Daniels admitted talking to the investors about the excitement of the Kluges in the program, the "ground floor" nature of the investment, and the prices that some of the Simbrah breeding stock recently had brought. *Id.* at 101–103. He also conceded that Mrs. Kluge had told the invitees at the Joyce Genetics demonstration that her husband had "a good track record," and that if he were behind the program, he "could and would" make it work. *Id.* at 140. However, Daniels emphasized that at that demonstration nothing was being offered; instead, "the meeting was just a social gathering to let them [the invitees] know what we [Albemarle Farms] were doing." *Id.* at 141.

## APPLICABLE SUBSTANTIVE LAW ON THE FEDERAL QUESTION

In attempting to resolve the jurisdictional issues presented at the juncture, the

---

**10.** Pursuant to a confidentiality agreement by the parties, the court at this juncture declines to reveal certain facts concerning the financial condition of the plaintiffs. The depositions shall remain under seal unless such seal is lifted by order of the court.

court begins with *Securities & Exchange Commission v. Howey*, 328 U.S. 293 [66 S.Ct. 1100, 90 L.Ed. 1244] (1946), wherein the Supreme Court defined an "investment contract," for federal securities laws purposes, as "a contract, transaction, or scheme whereby a person invests his money in a common enterprise and is led to expect profits solely from the efforts of the promoter or a third party." *Id.* at 298–99 [66 S.Ct. at 1103]. The parties agree that plaintiffs invested their money in a "program." Therefore the current battle lines between the parties are drawn over the other two prongs of the *Howey* test, namely, whether there was a common enterprise and whether the profits would come solely from the efforts of the promoters or third parties.

On the question of common enterprise, it appears axiomatic that only vertical commonality need be shown, i.e. a common venture between investor and promoter rather than among investors. *Brodt v. Bache & Co., Inc.*, 595 F.2d 459 (9th Cir. 1978); *Sunshine Kitchens v. Alanthus Corporation*, 403 F.Supp. 719 (S.D.Fla. 1975). Therefore, whether there was lateral commonality among the investors is irrelevant to a decision on this issue.

As to the final prong of the *Howey* test, the court notes that the word "solely" is to be given a practical, or realistic, interpretation rather than a literal one. *See e.g., S.E.C. v. Glenn W. Turner Enterprises, Inc.*, 474 F.2d 476 (9th Cir.), *cert. denied*, 414 U.S. 821 [94 S.Ct. 117, 38 L.Ed.2d 53] (1973). Therefore, the court must weigh all the realities of the transaction and determine whether the investors possessed any real power to control the management of their investment. *Fargo Partners v. Dain Corp.* 540 F.2d 912 (8th Cir.1976); *Miller v. Central Chinchilla Group, Inc.*, 494 F.2d 414 (8th Cir.1974); *Mr. Steak Inc. v. River City Steak, Inc.*, 460 F.2d 666 (10th Cir.1972); *Waterman v. Alta Verde Industries, Inc.*, 643 F.Supp. 797 (E.D.N.C. 1986). As one court observed, a determination may rest on whether the scheme, or,

as here, the program, "was being promoted primarily as an investment or as a means whereby participants could pool their own activities, their money and the promoter's contribution in a meaningful way." *S.E.C. v. Aqua–Sonic Products Corp.*, 687 F.2d 577, 582 (2nd Cir.1982). To put it another way, the court must weigh the circumstances to ascertain whether the powers granted to the instant investors were " 'so significant that, regardless of the degree to which such powers were exercised, the investments could not have been premised on a reasonable expectation of profits to be derived from the management efforts of others.' " *Rivanna Trawlers*, 840 F.2d at 241 (quoting *Williamson v. Tucker*, 645 F.2d 404, 419 (5th Cir.), *cert. denied*, 454 U.S. 897 [102 S.Ct. 396, 70 L.Ed.2d 212] (1981)). The court, then, will undertake to measure the rights and powers of the investors against the panoply of powers of the promoter in this case, keeping in mind that the substance of the transaction controls over its form. *Hector v. Weens, [Wiens ]* 533 F.2d 429 (9th Cir.1976); *MacKethan v. Peat, Marwick, Mitchell & Co.*, 439 F.Supp. 1090 (E.D.Va.1977).

Unlike the courts in such cases as *Waterman*, this court has been cited no reported decisions which "considered operations similar" to the one before this court. 643 F.Supp. 797, 806.[11] Accordingly, whether there are genuine issues of material fact that the program under consideration constitutes a security must be gleaned from the evidence in this record, and this record alone.

## CONTENTIONS OF THE PARTIES

Defendants, by counsel, have argued that the reasons behind each plaintiff's entry into the program, as well as each plaintiff's understanding of their respective bargains, belie commonality. Defendants suggest that such a conclusion is supported by plaintiffs' own evidence which, according to defendants, reveals separate ownership, separate and independent investment motives and expectations of profit and the

11. Despite plaintiffs' argument that animal breeding programs "routinely" are considered securities, they have failed to cite a single case that factually is on all fours with the one at bar.

fact that the plaintiffs do not agree on what constituted their individual agreements with Albemarle Farms. In support of their contention that commonality is lacking, defendants cite as examples: Woods' tax related motives; Curtis' desire to use the program as a form through which his Keswick development could be presented to Kluge; Bailey's desire to invest as a gesture of good will in view of the commissions he had earned as a result of sales of land to Kluge-related enterprises; and Cates' personal interests in the genetic aspects of the venture.

Defendants further have argued that no matter what each plaintiff contends to be the unwritten terms of their investment agreements, the written documents, by which all plaintiffs are legally bound, reserve to each plaintiff significant rights which were real and not illusory, though they were not fully exercised by any one of the plaintiffs. Each plaintiff, defendants contend, was and is a sophisticated business or professional man and had the opportunity intelligently to understand his contractual rights prior to executing the documents. In addition, each had the power to exercise those rights during the life of their relationship with defendants. Defendants, likewise, assert that all plaintiffs lived near the cattle operation, thereby giving them access to their herd in the event any chose to exercise his contractual rights. Furthermore, defendants suggest that all plaintiffs had title to their embryos as well as to the live animals each embryo produced, and they could have taken possession thereof at anytime. Defendants cite plaintiffs' own evidence that each investor participated in the ongoing oversight of their animals by taking steps that were consistent with their right to control the decision-making process. Woods' case, defendants argue, is just an example of how the investors rights further could have been exercised, such example revealing that the investors were not intended solely to be passive providers of funds for the venture but instead, participants in it. In

summary, the defendants offer that this dispute is no more that a contract dispute, lacking any federal jurisdictional bases and belonging, instead, in the courts of this Commonwealth.[12]

Counsel for plaintiffs views the facts differently. He argues that the "program" under consideration was more than a simple purchase of property, either in the form of the embryos or the resulting live animals. He contends that the program which was billed as a high-profit animal breeding venture was, in reality, nothing more than a scheme utilized by Kluge and Albemarle Farms to generate cash in avoidance of the farming operation's being declared a hobby and, thus, not a business for tax purposes. Counsel argues that, in this case, defendants "went to the public" to raise that cash.

Plaintiffs also suggest that the court must consider all the attendant circumstances of their entry into the program, and that the written documents, singularly, should not be dispositive of the issues in the case. They also contend that there is ample evidence in the record upon which a trier of fact could conclude that plaintiffs entered the program expecting long-term profitable returns on their investment and that the fortune of the entire program sold to them depended on the efforts of the defendants. As to Woods' transaction, counsel argues that, notwithstanding his involvement, the efforts of Albemarle Farms were essential if a profit were to be realized.

Lastly, it is contended that the termination and control provisions of the contract documents, considering the realities of this case, were illusory and not real. Plaintiffs' offer that it was Kluge's reputation for success, his farm's management skills and the defendants' exposure to the market that were the essence of the program, not who had the right to direct the progress of the animals. Simply put, plaintiffs contend that there are genuine issues of material fact over where the significant

12. Defendants have not raised a question of whether the offering in the instant case was private and not public, thus exempting the program from federal law. The court, therefore, does not here address such issue.

and essential managerial responsibilities lay, thus dictating a denial of summary judgment at this stage of the proceedings.

### DISCUSSION, FINDINGS CONCLUSIONS AND RECOMMENDATIONS

The question of whether the program constituted a common enterprise will not long detain the court. The court believes that the requisite commonality has been shown by the undisputed evidence in the case. Whether each plaintiff may have had different motives for entry into the program or whether any one or more of them may have elected to exercise their contractual powers is not determinative of the commonality question. Here the evidence, without material exception, shows vertical commonality. Therefore, on this ground the defendants' motion should be overruled, thus leaving for consideration the final prong of the *Howey* test, namely control over the investment.

While the Fourth Circuit in *Rivanna Trawlers* clearly approached the question of control from a far different perspective,[13] Justice Powell's reliance upon the language in Williamson in framing the court's "critical inquiry" provides insight to where this court should focus. As defendants suggest, the focus is not on control in fact, but on the power to make or control significant decisions.

Accordingly, the decision by the Eighth Circuit in *Fargo Partners v. Dain Corp.*, 540 F.2d 912 (8th Cir.1976) cannot be ignored. There, the investors purchased equity interests, though highly leveraged, in an apartment development. They also executed a management agreement granting to third parties an exclusive right to manage the project. The third party manager had broad and extensive though delegable powers; and under the investors could cancel the management agreement at any time upon 30 days notice.

The plaintiff in *Fargo* alleged that it had done nothing but supply capital and exclusively was relying upon the third party to exercise its management skills, which the investor did not have, to reap a profitable return on the investment. The investor, therefore, contended that its purchase, coupled with the management agreement constituted a security within the purview of federal law.

The Court of Appeals for the Eighth Circuit, however, concurred with the trial court's finding that the investment contract was not a security. It observed that where the investors retained only "nominal and insignificant" rights, where their roles were "perfunctory or ministerial" or where they "lacked any real control" over the investment, courts uniformily had found a security to exist. 540 F.2d 912, 915–916. The court then stated

> It is clear, however, that Fargo's role was a significant one despite the management contract. Fargo retained ultimate control of the operation ... by reserving the right to fire Candletree as its manager on thirty day's notice. *Id.* at 915.

Turning to the management contract at bar—since counsel for plaintiff concedes that the embryo purchase agreement is not at issue here—the court observes that Albemarle Farm was delegated considerable management responsibilities. *See, e.g.* Bailey Deposition Exhibit # 2, at ¶ 3. Nevertheless, the investors likewise were granted rights, among them the right to direct the practices of Albemarle Farms and the right to direct the sale of all or part of their individual herds. See, e.g. *Id.* at ¶ 4. Furthermore, paragraph 11 of the management agreement provided that the contract "... may be cancelled by the Breeder (investor) upon thirty day's written notice to Albemarle," in which event the investor was to relocate his herd and pay any "outstanding sums due on his account." *Id.* at ¶ 11.

Despite the existence of material issues of fact as to what may or may not constitute the balance of the terms of the investment contracts between the plaintiffs and

---

**13.** Investors in general partnerships historically have legal "control over significant decisions of the enterprise." 840 F.2d at 240.

defendants in this action, as well as the degree to which the investors would allow Albemarle to discharge its management authority, the court finds that the management agreement was a significant part of the basis of each investor's bargain with Albemarle Farms. The language of the entire agreement is unambiguous. Furthermore, the plaintiffs, in their complaint instituting this action, clearly and unequivocally allege the existence of such agreement. In large measure, their claims are premised on the existence of as well as the validity of the management contract, thus reflecting the materiality of that document to the relationship of the parties.[14] The proximity of the investors to the operation also afforded them meaningful access to the product of their investment and afforded them an opportunity to keep a pulse on Albemarle Farm's management efforts. Despite the contention of plaintiffs' counsel to the contrary, Wood's taking possessory dominion over his herd was an example of how some of the powers granted to all plaintiffs could have been exercised. Whether the powers were exercised by all, as the *Fargo* court put it, "is irrelevant." 540 F.2d at 915.

That Albemarle Farms properly or improperly may have exercised management powers is also not critical here. Its actions may have constituted a breach of the management contract, but any assertions in that respect must draw on the essence of the contract documents, thus emphasizing their role in this case.

The court is persuaded that the results in *Fargo* should obtain here. This is especially so in view of the Fourth Circuit's decision in *Rivanna Trawlers* which, though dealing with a markedly different investment vehicle, gives the lower courts guidances as to the role a grant of powers in an investment contract should play in determining the federal question. The court reaches this conclusion not unmindful of the decision in *Waterman v. Alta Verde Industries, Inc.*, 643 F.Supp. 797 (E.D.N.C. 1986), by Judge Dupree, a respected jurist

in this Circuit. There are two observations to be made, however, that reveal why the results there do not obtain here. First, while Judge Dupree noted a provision in the investment contract before him which granted the right of termination to both sides upon thirty day's notice, the importance of such provision in determining the federal question was never addressed, either by the litigants or the court. 643 F.Supp. at 803, 804. Secondly, Judge Dupree did not have the Fourth Circuit's guidance that has been afforded this court by *Rivanna Trawlers*. If he had, this court is confident that the issue directly would have been addressed and decided.

In summary, the court finds that no genuine issues of material fact exist on the jurisdictional question, and that despite some controversy as to what constituted all of the provisions of the investment contract, the terms of the unambiguous management agreement were an essential and substantial part of every plaintiffs' bargain. The court further finds that under that management agreement, the investors possessed significant powers material to the operation of the venture, powers that gave each the ultimate control over the venture, irrespective of whether any of such powers ever were exercised. Whether in some individual cases various of those powers were exercised by the investors and whether Albemarle Farms properly or improperly exercised its powers under the agreement are not determinative questions, for irrespective of the presence or absence of the exercise of contractual powers, the right to exercise those remained inchoate in each party.

For the reasons set forth in *Rivanna Trawlers* and *Fargo*, the court concludes that the investment contracts in this action were not securities under federal law. It is, accordingly,

### RECOMMENDED

that the court grant defendants' motion for summary judgment on the federal question

---

**14.** Wood's attempts in his deposition testimony to explain the circumstances surrounding and the timing of his execution of the agreement do not create issues of fact as to the existence, validity or materiality of the management agreement in this case.

and enter an order dismissing this action without prejudice to plaintiffs, in the event they elect to refile their remaining claims in the appropriate state forum. In view hereof, the court will not undertake to resolve the limitations of action or the release questions as they more appropriately should be addressed by the court deciding the merits of plaintiffs' remaining substantive claims.

The Clerk is directed to immediately transmit the record in this case to the Hon. James H. Michael, Jr., United States District Judge. Both sides are reminded that they are entitled to note objections, if any they may have, to this Report and Recommendation within ten days hereof. Any adjudication of fact or conclusion of law rendered herein by the undersigned not specifically objected to within the period prescribed by law may become conclusive upon the parties. Failure to file specific objections pursuant to 28 U.S.C. § 636(b)(1)(C) as to factual recitations or findings as well as to the conclusions reached by the undersigned may be construed by any reviewing court as a waiver of such objection.

Respectfully submitted,

This 7th day of November, 1988.